## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

### AFFIDAVIT IN SUPPORT OF CIVIL FORFEITURE COMPLAINT

I Wesley Parks being duly sworn, depose and states as follows:

1. I am currently a federal Task Force Officer with Louisville District Office (LDO) of the Drug Enforcement Administration (DEA) and a sworn police officer with the Jeffersontown Police Department (JPD), in Jefferson County Kentucky. I have been with JPD for approximately 9 years. Currently, I am assigned to JPD Narcotics Unit and have been so assigned for over 5 years. I am also assigned to DEA as a Task Force Officer and have been for approximately 4 years. During my employment, I have received specialized training on the subject of narcotics trafficking and money laundering, and have been personally involved in numerous investigations concerning the sale and distribution of controlled substances, including cocaine and marijuana, as well as methods used to finance drug transactions and launder drug proceeds. The facts set forth in this affidavit are intended to establish probable cause for the property subject to forfeiture in this Complaint (defendant property), and does not set forth all of the knowledge of your affiant regarding this matter. This affidavit is based upon my personal knowledge and upon information reported to me by Federal and local law enforcement officers and others with knowledge of the facts of this case.

2. On July 29, 2016, TFO Parks was contacted by Jason Gilliam of the Greater Cincinnati Northern Kentucky Airport Police Department regarding Tommy TO. Officer Gilliam advised TFO Parks via telephone that they received an anonymous tip from a telephone number (known but omitted from this affidavit). The anonymous caller stated that TO was traveling from (SDF) Louisville, KY International Airport to (SNA) Orange County California. The anonymous caller stated that TO would be arriving at SDF around 3:00 a.m. to 4:00 a.m. and should be traveling with a green backpack containing $200,000.00 in U.S. Currency. The anonymous caller was adamant about not revealing his/her identity for fear of his/her safety.

3. At approximately 5:30 a.m., Resident Agent in Charge (RAC) Scott observed an Asian male with a green shirt on and blue jeans exit the TSA screening area. SA Cates and TFO Parks observed him purchase a coffee at Starbucks and proceed to the A concourse of the airport.

4. TFO Parks and SA Cates stopped the male at approximately 5:40 a.m. in the A concourse, and identified themselves both visually and verbally as agents of the Drug Enforcement Administration. TFO Parks asked the male passenger if he could speak to him, and the male passenger stated "yes". TFO Parks then asked

the male passenger for some form of identification and the male passenger provided a California operator's license (number known but omitted) displaying the name of Tommy Mahn TO. The California operator's license reflected TO's address on Nezperce Way, in Bakersfield, CA. During the consensual encounter, TO was free to walk away at any time. TFO Parks asked where TO was flying to and TO stated that he was heading to California. TFO Parks asked TO why he was in Louisville, KY and TO stated that he was here visiting a friend. TFO Parks confirmed that TO was flying United Airlines to Orange County California from Louisville KY with a connecting flight in Houston Texas.

5. TFO Parks observed TO was nervous and breathing heavy. TFO Parks asked TO if he was traveling with any large amounts of narcotics or U. S. Currency and TO replied "no". TFO Parks asked TO if he would consent to search his person and carrying-on bag. TO responded "yes". During the search of TO's carry-on bag TFO Parks located large amounts of U.S. Currency concealed in the pant legs of TO's clothing inside the carry-on bag.

6. RAC Scott approached as TFO Parks was searching TO's bag. RAC Scott began talking to TO and asked why TO was travelling with such a large amount of U.S. Currency. TO stated that he sells nail supplies and that the U.S. Currency in his bag was from the sale of the supplies. TO did not have a name for his business and stated that he sells his supplies in Indiana to an individual named "Kevin", but didn't know to which city in Indiana he (TO) had traveled. TO further stated that he flew in 3 days prior.

7. TO then stated to RAC Scott that he was notified by "Kevin" via email that money needed to be picked up. TO stated he did not have a telephone number or the email address for "Kevin". TO stated that he had been to the Louisville, KY area approximately two months prior to picking up the money. RAC Scott asked TO how he (TO) knew where to go in Indiana to meet "Kevin", if he (TO) didn't even know in which city "Kevin" lived. TO stated he received a text from an unknown individual in California with the address for "Kevin". RAC Scott asked if he could see the text and TO said he (TO) was told to delete the message by the unknown person in California.

8. TO stated to agents that the money in his carry-on bag was not his and that he gets paid $3,000.00 U.S. Currency for picking the money up and returning it to California. TFO Parks asked TO if he had any U.S. Currency in his checked suitcase and TO replied "about $50,000.00". Agents had United Airlines pull TO's checked suitcase from the plane and bring it to the terminal. Agents verified a green suitcase with the matching baggage claim number that TO had on his person. Agents asked TO if that was his luggage and he replied "yes". TFO Parks asked TO for verbal consent to search the green suitcase and TO replied "yes". TO entered the code for the lock which was attached to the zipper and opened the suitcase.

9. Once the suitcase was opened, agents observed 5 individual vacuum sealed bags (Exhibit N-2) containing blue jeans. The blue jeans inside the bags contained large amounts of U.S. Currency. Based on agents' training and experience, money couriers utilize vacuumed sealed bags to store the US currency in an attempt to prevent narcotics canine from being able to "sniff" the currency.

10. When agents asked TO where the money came from, TO stated the following: the night prior to leaving Louisville, KY, an unknown "Mexican" came to his hotel room and took his green luggage. The "Mexican" then returned the luggage the following morning prior to his (TO's) departure to the airport. TO could not provide a contact telephone number, name, or description of the "Mexican" who picked up and dropped off the suitcase, nor could TO recall the location of the hotel in which he (TO) stayed. TO also stated that the money in the green suitcase was not his.

11. When questioned about the source of the money, TO stated "I don't ask, don't want to know, I just want to make a few extra bucks". TO went on to say "I thought it was easy money so I did it". RAC Scott asked TO if he could identify the intended recipient of the money in California. TO said he would eventually receive a text message from an unknown person in California with instructions on how to deliver the money, but TO could not provide any additional details. RAC Scott asked TO if he would cooperate with law enforcement in an attempt to identify "Kevin", the "Mexican", and their associates in California, but TO stated he did not wish to provide any additional information.

12. TO refused to sign the DEA form to indicate ownership of the U.S. Currency. After this, SA Cates provided TO with a DEA receipt for the seized U.S. Currency after which RAC Scott, TFO Parks and SA Cates left TO with his luggage.

13. Subsequently, SA Cates and RAC Scott transported Exhibit N-1 from the Louisville, Kentucky International Airport to the LDO where the seized currency was transferred to SA Duane Standafer for safekeeping.

14. Prior to transferring the Self Sealing Evidence Envelope containing the U.S. Currency to the Non Drug Evidence Custodian SA Duane Standafer, TFO Parks conducted a sniff of the U.S. Currency seized from TO, with a reliable and certified Narcotics K9 Blitz. K9 Blitz had a positive alert to the presence of drug odor emitting from the U.S. Currency.

15. On or about 08/02/2016, Loomis made an official count which totaled $140,820.00 in U.S. Currency.

16. In April of 2017, members of the LDO received information from ATF Louisville Field Division Special Agent Rachel Abbot who stated that in August of 2016, the ATF, Clarksville Police Department, Indiana State Police and other local law enforcement agencies began an investigation into a Drug Trafficking Organization (DTO) operating in the Jefferson County, Kentucky and Southern Indiana area.

17. SA Abbot received information that Toan NGO, Daren NGO, Charles NGUYEN, and Bryce MITCHELL are believed to be the main local distributers of narcotics. Additionally, the individuals identified as Frank NGUYEN, Quoc NGUYEN, Tommy TO, Kevin NGUYEN, and Phillip TRAN have been identified as suspected sources of supply (SOS) for these individuals operating out of the Los Angeles, CA metropolitan area. Tommy TO would utilize several of the local hotels where packages were delivered carrying suspected large quantities of marijuana.

18. This information was corroborated by a Confidential Source (CS) and the (CS) indicates that the aforementioned individuals are actively engaging in the distribution of large quantities of marijuana which they receive in bulk via UPS cargo shipments from the Los Angeles, CA metropolitan area, since approximately July of 2014. These transactions have taken place in both the Western District of Kentucky as well as the Southern District of Indiana.

19. The CS told law enforcement that they were acting as a drug courier for Toan NGO and regularly delivered about 15 pounds of marijuana to a small network of persons in and around Clark County, Indiana. The information further indicated that Toan NGO was selling an additional 30 pounds of marijuana a week in addition to the 15 pounds the informant was delivering for him.

20. Records reviewed during the course of this investigation showed that approximately one hundred and sixty (160) UPS parcels from the metropolitan Los Angeles area were sent to the southern Indiana area, to be delivered to area hotel/motel(s). All parcels from California origins were similar and consistent with a "dirty" parcel recovered during the course of the investigation. Through the detailed investigation, investigators found that the couriers were California based, and were flying into surrounding airports to retrieve these "dirty" parcels as they stayed at the coinciding hotel/motel(s) where the parcels were delivered. Once these "dirty" parcels were picked up, they were delivered to a contact with the local network, for distribution. Several hotel/motel employees were very familiar with the California couriers, due to the frequency of their stays.

21. Specifically, Tommy TO was confirmed to have stayed locally from July 26-28 of 2016, at three (3) different hotel/motel(s) where ten (10) "dirty" parcels were

delivered. These actions directly correlate with the cash (the defendant property) seized from TO during the airport stop on July 29, 2016, with the amount of marijuana delivered to the motel/hotel(s) and the price per pound.

22. As the result of this investigation, a federal civil forfeiture complaint was filed on May 18, 2017 in the Southern District of Indiana. *United States v. $16,820.00, et al.*, Case No. 4:17-CV-00086. Additionally, TO was charged in Indiana state court, in Clark County, with felony drug trafficking (over 10 pounds) and corrupt business influence. *State of Indiana v. Tommy To,* Cause No. 10C02-1702-F5-000048. The State of Indiana also charged Phillip TSAN Frank NGUYEN, Quoc NGUYEN, Toan NGO, Daren NGO, Charles NGUYEN, Lynsey RAY, and Bryce MITCHELL. The cases are pending as of the date of this affidavit and records show that there is an outstanding warrant for TO's arrest.

Your affiant believes that, based on the facts detailed within this affidavit and your affiant's training and experience, there is probable cause to believe that the $140,820.00 US Currency ("defendant property") represents money furnished or intended to be furnished in exchange for a controlled substance, represents proceeds traceable to such an exchange, and/or represents money used or intended to be used to facilitate a violation of the Controlled Substance Act, specifically 21 U.S.C. §§ 841(a) and 846. Consequently, the defendant property is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

Further your affiant sayeth naught.

Wesley Parks, Task Force Officer
Drug Enforcement Administration